near the first case, Marcus v. Daniel E. Smith. May it please the Court. Plaintiffs or appellants contend that the Court erred in dismissing plaintiffs' claims with prejudice before getting the benefit of a ruling that highlighted certain deficiencies that the Court found in plaintiffs' complaint. The second amended complaint alleged that under a contract that the parties entered into, if a subsequent agreement was entered into that had the effect of a liquidation, then the plaintiffs would receive additional consideration. There was a dispute over what constituted or what was required to be pleaded for subsequent or for effect of a liquidation. Now, the charter here appears to rule out the possibility that a liquidation could be a sale of assets. Is that right? Liquidation alone would . . . A liquidation alone? Well, sorry, the sale of assets alone would not be a liquidation. However, in this case, there was not only the complete sale of all of the hotels. It was a real estate investment trust.  They sold the hotels. They terminated all their employees. Okay, but I want to make sure I understand whether you're contesting this part. The applicability of the charter in this case, because as I look at the definition of a subsequent transaction, it appears to include, and I'm quoting, any liquidation event pursuant to the company's certificate of incorporation. And you would agree that essentially the charter then is, and its definition of what is not a liquidation, should be considered by us? Yes, its definition which that, yes, the sale alone is not a liquidation. Okay. So help me understand then why the sale of a lot of hotels, most of them initially according to, or all of them according to the initial agreement, should not be excluded then from being a liquidation? Because how is it that you plausibly allege, I should say, a de facto liquidation if in fact we have to kind of take the sale of assets out of the equation? I think it's a sale plus the other factors. Like I said, they terminated all their employees. They ceased doing business under their charter as managing, operating, and owning hotels. They distributed or they paid debt. And did that all happen within the purchase period? I don't think it had to happen in the purchase period. The way the contract is worded, it says there has to be one contract, a binding agreement entered into in the purchase period. The subsequent transaction describes a broader sense in that it says a subsequent transaction is one or more events, conditions, transactions, contracts, agreements, or any other occurrences. So the contract at the beginning when it says before the one-year anniversary of the stock purchase agreement, defendants directly or indirectly entered into a binding agreement in a subsequent transaction. So the binding agreement can be one part of a larger event, which could be many other contracts or transactions, which is what happened here. They entered into the ARC transaction to sell 96 out of the, I believe, 100 hotels or 100 out of 110, and then terminated all their employees and started winding down the company. It wasn't a simultaneous. It doesn't say the subsequent transaction has to close within the one-year period. What do we make, though, of the, again, under the additional purchase price provision, and I'm directing you to A246 of the record, in which it states that any transaction or other event that is concipated on or after the end of the payment period should not be considered? Well, that's the, under, I don't believe that's the applicable provision. It talks about the payment. It doesn't matter when the payment is paid. There is, there are two provisions, and the part that talks about. Well, let me just be clear about this. Have you got it in front of you? I don't. I'm looking at the additional purchase price provision. Okay. The last sentence of that. It states, in no event shall any additional purchase price or other consideration of any kind be due or payable in respect of any transaction or other event that is consummated on or after the end of the payment period. And my question is, why isn't it reasonable to look at that and to say, well, to the extent that you're complaining about later transactions or events, they're not supposed to be part of this? Well, I believe that the one-year anniversary provision that we're talking about has, talks about that if the one contract is entered into prior to the one-year anniversary, it's directly, that provides for shareholder consideration to be paid in respect to a preferred stock transaction, preferred stock in a subsequent transaction, or entered into a binding agreement that provides for one or more payments to a stockholder in respect to the preferred stock in a subsequent transaction, regardless of whether such payments are made during or after the payment period. It doesn't speak to a closing. It speaks to just, it says, entered into a contract. It speaks to whether there was a binding agreement during the period. It does speak to whether there was a binding agreement during the, one binding agreement in a subsequent transaction. And this is an agreement, the ARC transaction, that subsequently changed over time, as I recall. Is that right? Hotels were called out. I believe there was a due diligence period and hotels were dropped. But it was a binding agreement, and again, we were focused on the effect of a liquidation. Everything was being liquidated. They sold 96 percent of the hotels. They ended up selling 100 percent of the hotels. The ARC transaction was a binding agreement that was entered into before, I think it was entered into in May, before the August deadline. And it had the effect of a liquidation because as soon as they entered into that contract, they then shut down the business and started the wind-down process. On the memorandum of understanding, and this question goes to your good-faith and fair-dealing claim, in this second amended complaint and in the proposed third amended complaint, as I understand it, you just allege facts about the memorandum of understanding, but that memorandum of understanding was not binding, so it would not have triggered the additional purchase price. No, and it was not binding. The good-faith and fair-dealing claim is based upon the fact that it was entered into just outside within a week or so of the August period, and that it was intentionally labeled non-binding in an effort to avoid the payment provision. It's separate from the ARC transaction triggering event. My understanding is that you're now arguing for the first time on appeal that Grace violated its implied duty of good-faith and fair-dealing by intentionally delaying entering into a binding settlement until the year it passed. Why should we on appeal give you a second bite of the apple? I don't think we argued that for the first time on appeal. I believe that was in the original complaint, the first amended complaint, which is an unredacted version of the original complaint and in the second amended complaint. If we were to find that, if we were to find differently from your view as to the liquidation, what is your best argument beyond that? Can you explain that again? Assuming we find that the asset sale to ARC was not effectively a liquidation, how can you prevail? I think it would then go to the good-faith and fair-dealing argument on the settlement agreement with the class, and that that should be considered a second contract within the payment period. Okay. Thank you. You'll have time for rebuttal, I believe. Good morning, Your Honors. May it please the Court. Sharon Nellis for Defendant Zappalese. I think the Court has honed in on the fact that the crux of the dispute here really turns on whether or not that there is an argument that the ARC transaction, or ARC transaction as it's sometimes referred to, was in fact a binding agreement to pay stockholder consideration. And I think the conclusion is compelled that it is not. Again, as you've noted, the plaintiffs argued that the ARC transaction had the effect of a liquidation, triggering the liquidation payment preference under the amended charter, so you have to go to the amended charter. The amended charter says in discussing the liquidation preference, you need a voluntary or involuntary liquidation. And a voluntary or involuntary liquidation shall not include a sale or transfer of all or substantially all the corporation's assets. And of course, the purpose of that carve-out, which is a pretty common carve-out in charters involving preferred shareholders, is so that preferred shareholders cannot challenge the board's freedom to sell its assets or, for example, enter into a merger. So an agreement to sell assets, and I think we have agreement here alone, cannot bind the corporation to dissolve. Thus, there is no liquidation under the amended charter, effective, voluntary, involuntary, or otherwise. We think this is dispositive, and you don't need to go any further. And the invocation of post-transaction events that plaintiffs want to add to the fourth complaint really cannot help, because the issue there is not whether or not the company undertook actions leading to the winding up of its affairs. The issue is whether or not the ARC transaction itself bound Grace to take actions that compelled payment of the liquidation preference as a result and not pursuant to any other course of action permitted under the amended charter. And the answer has to be plainly no. And that's established in the facts that the, by the fact that the agreement to sell the assets was conditional. It was impossible, impossible for Grace to have planned or even, or certainly not committed at the time of the transaction, let alone bind itself. Indeed, that agreement, which was a conditional agreement, was amended in November 2014. It carved out ten hotels, which Grace still owned, when the deal closed ten months later in March of 2015. The fact that it was later amended doesn't mean that the first version wasn't binding. No, no, it certainly was a binding agreement. What it was not was a binding agreement to wind down, to liquidate, such that it would trigger the additional purchase, the payment of the liquidation preference. I thought the purchase, the additional purchase provision required entered into a, and I'm quoting it, a binding agreement that provides for one or more payments of stockholder consideration. It doesn't seem to say it has to, that the binding agreement has to say, hey, this is an agreement to liquidate. Here, Your Honor, what the additional purchase price provision says, and I think it's important to note that it is item two in the language of the additional purchase price provision. So it's either you make a payment in exchange for a stockholder share, or you enter into a binding agreement that's going to require one or more such payments of stockholder consideration in respect of a preferred share. And that, there's nothing here that bound the defendants to pay stockholder consideration. And I would note, and I would note that this is in documents that plaintiffs themselves put into the record in response to their, in their opposition to our motion to dismiss, that not only did Grace end up retaining ten hotels, it also retained $447 million worth of equity interest. It was the indirect owners, it had indirect ownership interest with rights to properties in the event of a default. So the idea that somehow within the one year payment period before August 9, that there was a binding plan to liquidate such that, that the additional purchase price provision would be triggered by a liquidation preference, makes no sense. It also makes no sense because, of course, the company did pursue another course. In 2016, it merged with its subsidiaries pursuant to a shareholder vote, which was a perfectly permissible course of action under the amended charter. So the idea that allegations of subsequent sales of those ten hotels, that there was a subsequent retirement of debt later down the road, that there was some distribution of monies is really of no matter unless what plaintiffs ultimately do is establish that the plaintiffs, that the company, the defendants, had a binding obligation that was triggered within the one year payment period to liquidate and pay the preference as a result of the ARC transaction. And these allegations do not get anywhere close to establishing such a binding obligation. It would be simple, wouldn't it, to amend the complaint to refer to the final binding settlement instead of the memorandum of understanding? I'm sorry, Your Honor, may you repeat? Wouldn't it be simple to amend the complaint to refer to the final binding settlement rather than the memorandum of understanding? That would fail on its face, Your Honor, for the following reason. The final stipulation of settlement, the binding stipulation of settlement, was entered into outside the one year payment period. So the MOU actually fails for two reasons. It fails because it wasn't an agreement. It wasn't entered into within the one year payment period. And even if it had been, even if we accept plaintiffs' allegations of some intentional delay, that it would still in any event have been, it would have been a non, it was a non-binding agreement so it could not have triggered the asset, the additional purchase price provision. And I think actually the MOU argument is pretty simple. Defendants owed no duty under the contract to enter into any transactions during the one year period. There was no duty imposed by the contract to somehow undertake some kind of effort to get an agreement done within the one year period. And the fact that there was a temporal limitation made it plain that both parties understood something could happen after the one year period, including such a settlement, which is specifically referred to. But let's say you replace MOU with stipulation of settlement. Yes. Why wouldn't there be a plausible claim? Why wouldn't there be? Yeah. If there was a stipulation of settlement was entered into in October of 2014, the relevant period for entering into a binding obligation ended on August 9, 2014. So if the complaint is amended to refer to the binding stipulation of settlement, it will fail because it's outside the one year period. I mean, it gets to the question of whether it's plausible that the parties awaited two months to enter into the binding agreement only because they wanted the agreement to be well outside the one year window. I understand and I accept that for purposes of considering a motion to dismiss, we are going to accept plaintiff's allegation that there was some undue delay here that was intentional. But even in that event, it doesn't matter. The law in New York is quite clear. The duty of good faith cannot be used to create an independent obligation beyond the contract. And that is the Phoenix case that we cite in our papers. And this is exactly what plaintiffs are attempting to do here, to impose an obligation into the contract that does not exist, requiring the parties to attempt to enter into it within the one year period. And that simply fails under New York law. The parties' obligations are defined by the contract, and the plaintiffs can point to no provision in the contract with which plaintiff defendants did not comply. May I ask about the law clerk issue? Certainly, Your Honor. I'm not proposing counsel about that yet, but I do have a question about whether it was known to your firm that the judge's law clerk was working on the case in which your firm was involved. Your Honor, I personally was not, and this is not in the record, I personally was unaware or I certainly did not recognize the clerk, but I will tell you I often walk into courtrooms where I see former summer associates and I see them in the courtroom. I understand that, but here's I guess the concern. It seems like the facts that we have, upon which there was no hearing, reflect that this law clerk had previously in the prior summer after graduation from law school worked for the firm. Yes, had been a summer associate. Quite immediately after leaving the clerkship apparently. And the facts are a bit hazy because there was no underlying inquiry or hearing, starts to work with the firm. And if for purposes of looking at the standard under Section 455A and we look at kind of what the appearance is here, should there be a concern there? I don't think so, Your Honor. The facts in the record I think are not uncommon. We have a law clerk who worked for a major New York law firm, left the law firm, went to clerk for a judge sitting in the southern district of New York, completed his clerkship and returned after completing his clerkship to an associated with the firm. Wouldn't there be a fair inference from just what we know here that his intent at all the time and perhaps the firm's intent at all the time was for him to continue working for the firm as soon as he left? I don't know that that's a fair inference, Your Honor. I think, and you probably know better than I know, but that clerks leave our firm all the time. Wouldn't a reasonable person looking at the pattern of employment here think that, well, it looks like this law clerk has an allegiance to this particular firm in which he's participating in the case? I'm not sure I agree, but I also don't agree that that's the inquiry here. First of all, if I may, I just want to make note that this is a case with respect to the clerk issue where the appellants are asking you to vacate a judgment that you were in the process of reviewing DeNovo so that they can obtain a DeNovo review. I'm aware of the Parker case. Right, and so we're already on the harmless error standard, but . . . Does the record show whether the clerk had agreed to return to the firm after the clerkship? Was there an employment agreement in place? You mean prior to . . . at what point in time, Your Honor? Does the record show that the clerk, when clerking, had agreed to return to the firm following the clerkship? At some point. The record shows that the clerk did, in fact, return to the firm on October 3, but that's . . . Yes, he did. Yes, so obviously, yes. So, obviously, there was an agreement in place? At some point, the clerk accepted the offer, for sure. When was that? Does the record show when that occurred? The record does not show when that occurred. Does the record show that there was an offer outstanding to the clerk during the time he was a clerkship? I do not believe the record shows that one way or the other, but I will concede I think it's a fair inference that most law clerks leave their summer employment with an understanding, whether official or unofficial, that they are welcome to return and come back and have conversations about that so long as they are having disclosed that with their judge. Now, of course, we send the clerks off to clerk for the judicial officer and we expect that they discuss how that's going to be managed in chambers and they are managed appropriately in chambers. And we start with the proposition, and I think you need to as well for purposes of considering this issue, that judges are presumed to be impartial and the plaintiffs themselves do not suggest that Judge Daniels himself was impartial. The issue here is specifically whether or not the fact that a law clerk worked on a case and later joined the firm post-clerkship impacted that presumed impartiality. And to return to your question, Judge Meyer, I think the answer has to be no for the very reasons that Judge Forrest articulated in her review of the situation. An objective observer would not believe that a law clerk's employment history affected a district court's handling of the case, particularly here where the judge was personally and significantly involved. There were multiple conferences. There was extensive oral argument. The transcript shows the decision tracts, the judge's personal comments, at argument. But we don't know what conversations occurred before then, and I'm not saying that they did. How they did, I'm again focusing, without any suggestion that there's bad faith, on what a reasonable person would draw from the conclusion. And I'm not sure a reasonable person would say, well, the judge asked a lot of questions during an argument. That must mean that the judge was not influenced by the clerk's views and guidance on what's a pretty technical case. Well, I would note, as the panel I'm sure knows, is that the Code of Conduct for Judicial Employees does not forbid a clerk from working on a case involving a past or future law firm. Rather, the Code states that the clerk should bring that to the court's attention. And if a law firm with which a court has been employed or obtains future employment appears in the matter, again, the management of that situation is left to the court's discretion. And I would urge the mere fact that a former summer associate worked on a matter and later associated with a firm should not, would be a cause for a deep inquiry. The inquiry here started when our law firm, in accordance with the rules of New York's professional responsibility, sent a letter alerting the court and opposing counsel that we had hired his former law firm. If that was a trigger for a recusal inquiry, I think we would be running very directly into the concern that Judge Forrest noted about the use of a clerkship employment history opportunistically, and I do not think that, or I would urge the court that this is, without more in the record, that this is not a road we should travel. Thank you. Thank you. On the clerk issue, with respect to whether or not there was anything in the record that shows when the offer was extended and accepted, we made an inquiry. We tried to be respectful when we got the notice that the clerk who was on the case and had substantively and personally worked on the case went to work for Sullivan and Cromwell. We sent a letter saying, when did this happen? And we tried to be respectful to get information. Judge Daniels denied that request after he recused himself, so we were never allowed to get any information from anybody to determine when the information was known by whom and when the offer was accepted. Counsel cited to Judge Forrest in saying that there's no evidence that Mr. Krylov's participation in the case as a clerk affected the court. That's not the test. The test is the appearance to the reasonable person. I believe one court said the man on the street standard and would it affect or cause somebody to question the integrity of the court. I believe it was the Hall case out of the Fifth Circuit where they went and they said, we cannot know what happened behind the scenes. Let's say that we were to determine that the judgment was appropriately entered on the merits, hypothetically. Then where would the risk of injustice to the parties be if relief is denied? If the judgment was entered on the merits, which the judgment as written was not. If we said that the judgment was appropriately entered on the merits, in essence affirmed on the merits, then what happens to this conflict of interest? I think that's one of the factors. Actually, I believe it's the Parker case that lays out the three factors. I believe that's the first one is the risk of harm to the plaintiffs in this case. I believe that that factor would obviously weigh against us. But again, the technicality in which Judge Daniels said that we failed to plead the de facto liquidation factors, not that the contract as written did not apply to the facts in the case. It wasn't a merits-based decision. Instead, it was you did not hit these pleading requirements of a Delaware case involving, in our case, we had a Tennessee corporation suing on a New York contract and a Delaware de facto liquidation standard was to apply. We could have met the factors that he said we did not plead. Given the basis though, the fact that we essentially are engaging in de novo review, how is there harm here if we were, in fact, exercising our de novo review here and find that there was no error? Do you interpret the contract, basically? I don't think there would be or there may not be, but probably the first factor seems to be the controlling factor of the three in Parker. Thank you. Thank you both for your arguments. The court will reserve decision.